UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

| | |
|---|---|
| **JON HANSON, Individually and On Behalf of All Others Similarly Situated,**<br><br>**Plaintiff,**<br>**v.**<br><br>**BERTHEL FISHER & COMPANY FINANCIAL SERVICES, INC., and THOMAS JOSEPH BERTHEL,**<br><br>**Defendants.** | **CASE NO. 1:13-cv-67**<br><br><br>**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiff Jon Hanson, individually and on behalf of all others similarly situated (the "Class"), by and through his attorneys, files this Class Action Complaint against Defendants Berthel Fisher & Company Financial Services, Inc., ("Berthel Fisher") and Thomas Joseph Berthel ("Berthel") (together, the "Defendants") and alleges, upon investigation by counsel and belief, as follows:

## INTRODUCTION

1.      Defendant Berthel Fisher was the underwriter, promoter, and Managing Broker-Dealer of the TNP 2008 Participating Notes Program, LLC (the "TNP 2008 Scheme" or the "Scheme"), a fraudulent real estate investment program and a Ponzi-like scheme.

2.      The Scheme was organized and initiated in 2008 by Thompson National Properties, LLC ("TNP"), ostensibly to offer investors nationwide the opportunity to participate in investments in the real estate market.

3.      At the time, TNP was a newly-formed company, the stated purpose of which was to organize real estate investment programs, raise funds for such programs from investors

nationwide through public or private offerings, and thereafter manage such programs and provide other services to them.

4. In reality, TNP commingled funds it raised through its programs and used investor money to make distribution payments to investors in other programs it sponsored, in Ponzi-scheme fashion.

5. As the Scheme's promoter, Berthel Fisher played a key role in recruiting investors to it.

6. Berthel Fisher was instrumental in the preparation and dissemination of the Scheme's Private Placement Memorandum (the "TNP 2008 PPM") and oversaw the preparation and execution of the Scheme's securities offering (the "Offering").

7. As the Scheme's underwriter, promoter, and Managing Broker-Dealer, Berthel Fisher had a duty to conduct an independent, thorough, and reasonable investigation of the Scheme and the Offering to ensure that they did not violate the applicable securities rules and regulations.

8. The TNP 2008 PPM contained numerous material misrepresentations and omissions. For instance:

    a. The TNP 2008 PPM indicated that the Offering proceeds would be used for real estate investments but failed to disclose that such proceeds would be commingled with proceeds from other TNP-sponsored real estate investment programs and used for distribution payments to investors in other such programs, in Ponzi-scheme fashion;

    b. The TNP 2008 PPM indicated that TNP guaranteed the Scheme investors' investments, as well as the interest payments on such investments, but failed to disclose that such guarantee was worthless because TNP did not have the financial ability to make good on it;

2

c.   The TNP 2008 PPM made clear the viability of Scheme depended upon TNP's own viability but failed to disclose that TNP's financials were deteriorating fast, TNP had defaulted on its financial obligations, and TNP's losses and negative cash flow threatened its viability;

d.   The TNP 2008 PPM made clear the Scheme's success depended upon its management by TNP but failed to disclose the misappropriation of investor funds and other serious misconduct in several other TNP-sponsored real estate investment programs;

e.   The TNP 2008 PPM omitted to disclose that TNP and its affiliates were dependent on continuously raising new capital to meet their existing financial obligations.

9.    Berthel Fisher's close relationship with TNP and its participation in offerings by other TNP-sponsored real estate programs gave it extensive access to TNP and such other programs. Such access allowed Berthel Fisher to gain knowledge of the misconduct and red flags indicating misconduct that surrounded TNP and its offerings.

10.   Berthel Fisher had actual knowledge of misrepresentations and omissions in the TNP 2008 PPM and failed to investigate red flags that pointed to other misrepresentations and omissions.

11.   Through the use of the misleading TNP 2008 PPM, Berthel Fisher helped raise approximately $26,224,903 from Plaintiff and the members of the Class.

12.   At all relevant times, Berthel was Berthel Fisher's control person. In that capacity, he supervised and/or directed Berthel Fisher's securities business as well as specifically Berthel Fisher's complained-of conduct, and oversaw Berthel Fisher's compliance with the securities rules and regulations.

3

13.     On June 11, 2013, the Financial Industry Regulatory Authority ("FINRA") entered an Order Accepting Offer of Settlement, (the "Order") in which it sanctioned the former Chief Compliance Officer of a TNP-controlled securities broker-dealer firm that acted as the underwriter and/or promoter of several TNP-sponsored programs, including the Scheme, for failing to adequately investigate such TNP programs prior to promoting them to investors, among other things. The Order is attached to this Complaint as Exhibit 1.

14.     In its Order, FINRA noted multiple violations of securities rules and regulations by several TNP offerings, including the Scheme.     Such violations included material misrepresentations and omissions, commingling of funds among various programs, and Ponzi-like payments of distributions to investors with other investors' money.

15.     Plaintiff and the members of the Class were investors in the Scheme and bring this action to recover losses and damages suffered as the result of Defendants' misconduct.

## PARTIES

16.     Plaintiff, Jon Hanson, is a citizen of Colorado.  He is retired and resides in Louisville, Colorado.

17.     Defendant Berthel Fisher is a company registered in Iowa, with its principal place of business located at 701 Tama Street, Building B, Marion, Iowa 52302-0609.

18.     Berthel Fisher is a securities broker-dealer firm and a member of the Financial Industry Regulatory Authority, an organization that regulates securities broker-dealer firms in the United States and has enacted rules of conduct that such firms must follow in their securities business.

19.     Berthel Fisher advises the investing public that it specializes in a variety of alternative investment product offerings, including real estate investment products.

4

20.     The misconduct alleged in this case is not Berthel Fisher's first instance of compliance and supervision failure. Berthel Fisher has been sanctioned by securities regulators across the country in 21 instances of securities rule violations as a result of deficiencies in its compliance and supervisory systems.

21.     Berthel Fisher had been aware of shortcomings in its compliance systems and procedures pertaining to its participation to private offerings of securities. Two years prior to engaging in the promotion of the Scheme, Berthel Fisher was sanctioned by FINRA's predecessor, NASD, for faulty procedures that were not "reasonably designed to achieve compliance with applicable rules and regulations relating to private offerings of securities."

22.     Defendant Thomas Joseph Berthel was Berthel Fisher's Chief Executive Officer and Chairman of the Board, as well as one of its indirect owners, at all relevant times. In the CRD Form filed with FINRA, Berthel Fisher answered the question "Does [Berthel] direct the management and policies of [Berthel Fisher]?" with "Yes."

23.     Because of his position of control and authority as executive officer, principal, and co-owner of Berthel Fisher, Berthel was able to and did control Berthel Fisher's activities, including its preparation and dissemination of misleading offering documents for TNP offerings including the TNP 2008 Scheme, and its management and oversight of the TNP 2008 Offering.

## JURISDICTION AND VENUE

24.     This Court has original jurisdiction pursuant to 28 U.S.C. § 1332(d), as the aggregate amount in controversy exceeds $5,000,000, at least one class member is a citizen of a State different from a defendant, and more than one third of all Class members may reside outside of the State of Iowa. According to filings with the Securities and Exchange Commission,

5

Defendant solicited and/or oversaw the solicitation of potential investors in the Scheme in at least 34 states.

25.     Venue is proper under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims alleged below occurred in this District and because Defendant resides in this District.  Venue is also proper because Defendant transacts and has transacted business in this District at times material to this action.

## FACTUAL ALLEGATIONS

### I.     TNP IS FORMED IN 2008.

26.     In or about February 2008, Anthony "Tony" Thompson formed Thompson National Properties, LLC, a Delaware limited liability company.  TNP was formed for the purpose of investing in the real estate market directly and through real estate investment programs it sponsored.

27.     To accomplish its purpose, TNP, directly and through wholly owned and/or controlled affiliates, purported to engage in real estate transactions, organize real estate programs, promote such programs, and/or conduct private or public offerings to recruit investors in such programs, manage real estate properties it owned, and manage real estate programs it organized.

28.     The real estate programs sponsored by TNP were designed to be wholly dependent upon TNP to successfully operate.  The programs relied upon TNP and/or its wholly owned and/or controlled affiliates to invest their investors' money, identify real estate investment opportunities, obtain financing, manage real estate assets, engage in other real estate transactions, and otherwise conduct and oversee the programs' business functions including accounting and bookkeeping, human resources, and collection and disbursement of funds.

6

29.     Thus, TNP's viability, financial resources, and ability to conduct such activities for the programs it sponsored were crucial to the success of such programs.

## II.     TNP ORGANIZES AND PROMOTES REAL ESTATE INVESTMENT PROGRAMS WITH DEFENDANTS' HELP.

30.     Starting in March, 2008, TNP organized and promoted a number of real estate investment programs.

31.     Berthel Fisher, under the direction and supervision of Berthel, assisted in the promotion of several TNP programs as a Managing Broker-Dealer, underwriter, and/or retail broker.

32.     On or about March 3, 2008, TNP commenced a private placement offering in a real estate investment fund called Bruin Fund, L.P. (the "Bruin Fund"). The Bruin Fund purported to invest in real estate and other opportunities via real estate loans, operating companies, and real property transactions.

33.     On or about June 3, 2008, TNP commenced a private placement offering of promissory notes in a real estate program called TNP 12% Notes Program, LLC (the "TNP 12% Program"). The TNP 12% Program purported generally to fund loans to or equity investments in TNP or its affiliates. Interest payments were to be paid to investors quarterly.

34.     The TNP 12% Program's Private Placement Memorandum stated that payment of interest and repayment of principal will be unconditionally guaranteed by TNP, TNP 12% Program's parent.

35.     Berthel Fisher helped promote the TNP 12% Program to investors.

36.     On or about June, 23, 2008, TNP commenced a private placement offering in a real estate investment fund called TNP Vulture Fund III, LLC (the "TNP Vulture Fund"). The TNP Vulture Fund purported to invest in real estate opportunities.

37.     Berthel Fisher helped promote the TNP Vulture Fund to investors.

7

38.     On or about December 9, 2008 TNP commenced a private placement offering of promissory notes in the TNP 2008 Scheme, the real estate investment program directly at issue in this lawsuit. The TNP 2008 Scheme purported generally to fund or invest in, directly or indirectly, real estate and real estate-related debt.

39.     The TNP 2008 PPM stated that payment of interest and repayment of principal would be guaranteed by TNP, its parent, and that TNP would pledge all of the membership interests in the issuer to the purchasers of the TNP 2008 Scheme notes as collateral for such guaranty.

40.     Berthel Fisher oversaw the securities offering for the TNP 2008 Scheme to investors, as Managing Broker-Dealer and underwriter.

41.     On or about August 7, 2009, TNP commenced a public offering of securities in a real estate investment program called TNP Strategic Retail Trust ("TNP SRT"), a real estate investment trust.

42.     On or about April 26, 2010, TNP commenced a private placement offering of promissory notes in connection with the TNP Profit Participation Program, LLC ("TNP PPP"). According to its Private Placement Memorandum (the "TNP PPP PPM"), the proceeds of the TNP PPP offering generally were to be used to invest in or fund, directly or indirectly, real estate and real estate-related debt.

43.     The TNP PPP PPM stated that payment of interest and repayment of principal would be guaranteed by TNP, its parent, and that TNP would pledge all of the membership interests in TNP PPP to the purchasers of the Notes as collateral for such guaranty. The PPP PPM disclosed that "TNP has suffered losses since its inception," and that since 2008, TNP had guaranteed the unsecured debt obligations of the TNP 12% Program and the TNP 2008 Scheme, which together had raised almost $50,000,000.

8

44.     TNP conducted offerings for all of the TNP programs mentioned above at the same time. It encouraged investors to invest in more than one of the TNP programs. It raised funds from investors in its programs for the same purpose: to invest in real estate in the same geographical markets.

45.     TNP managed the TNP programs concomitantly, from the same offices, and through substantially the same senior management.

46.     TNP commingled funds from investors in the TNP programs and used investor money to pay distributions to investors in other TNP programs in Ponzi-scheme fashion, as more fully detailed below.

### III.     TNP ORGANIZES THE TNP 2008 SCHEME.

47.     On or about December 9, 2008, Defendant organized the TNP 2008 Scheme. The principal place of business of the TNP 2008 Scheme was located in Irvine, California.

48.     The TNP 2008 Scheme was organized as a Delaware limited liability company, whose sole member and manager was TNP. TNP's equity contribution to the limited liability company was only $1,000.

49.     The TNP 2008 Scheme purported to raise $25,000,000 from investors nationwide. The proceeds were to be used to fund or invest in real estate and real estate-related debt.

50.     As TNP 2008 Scheme's manager, TNP was to play a key role in its activities. According to the TNP 2008 PPM, TNP was to, *inter alia*:

> a.  Negotiate the purchase of real estate properties;
>
> b.  Operate and manage such real estate properties;
>
> c.  Monitor the performance of such properties;
>
> d.  Review and evaluate financial aspects of such properties;

9

     e. Oversee real estate tax assessments;

     f. Compensate the securities broker-dealer firms involved in the promotion of the TNP 2008 Scheme;

     g. Manage accounts and administer distributions to investors;

     h. Collect the rent and other amounts due and make payments; and

     i. Oversee the TNP 2008 Scheme's accounting and finances.

51.    The TNP 2008 Scheme issued three classes of notes, which purported to pay between 10-13% interest on the investors' investment. It promised to pay interest on the investors' notes immediately following the acceptance of the investment.

## IV.   DEFENDANTS LEARN THAT TNP'S FINANCIAL CONDITION HAS SUBSTANTIALLY DETERIORATED.

52.    TNP's financial situation began to deteriorate shortly after its formation and continued to worsen over the following months and years.

53.    By April 2008, TNP had suffered losses of $444,421. By September 2008, TNP's losses reached $4,058,000. Between April and September 2008, TNP's equity fell from $8,505,897 to $5,393,188 — a 36.5% drop in only five months.

54.    By November 2008, two TNP real estate operations had defaulted on their financial obligations, in an amount that approximated $1,300,000. The two entities had received formal collection letters from Grubb & Ellis, the entity to whom they owed the past-due amounts.

55.    Between January and September 2009, TNP incurred operating losses of approximately $16,000,000, resulting in a negative net equity of approximately $6,700,000. For the year ending December 31, 2009, TNP incurred operating losses of approximately $25,839,000, resulting in a negative net equity of approximately $13,580,000.

10

56.     During 2009 and 2010, TNP and certain of its affiliated entities were experiencing severe cash flow deficiencies and accruing substantial accounts payable, while at the same time lacking sufficient cash or cash equivalents to satisfy creditors in a timely manner.

57.     The TNP 2008 PPM never disclosed to its investors the substantial deterioration of TNP's finances. Indeed, the TNP 2008 PPM continued to be distributed with the September 2008 TNP Balance Sheet, which substantially misrepresented TNP's finances.

58.     Defendants were aware of the worsening condition of TNP's finances, and also of the fact that the TNP 2008 PPM did not disclose this worsening condition to investors.

59.     Defendants learned of TNP's financial condition at different points in time because of their close relationship with TNP and because they helped promote several TNP programs to investors. Such programs typically included TNP financial statements from different financial reporting periods with their prospectuses or private placement memoranda, which Defendants distributed to investors. From the TNP financial statements attached to various programs, Defendants were able to learn of the substantial worsening of TNP's financial condition.

## V.     TNP COMMINGLES FUNDS RAISED FROM INVESTORS IN THE TNP 2008 SCHEME AND OTHER PROGRAMS.

60.     Some of the TNP programs purported to operate as stand-alone investment vehicles that held real estate investments in their own name, while others were pass-through entities designed to raise funds and transfer them to TNP. Regardless, TNP commingled funds it raised from investors in several programs it sponsored, including the TNP 2008 Scheme.

61.     Examples of commingling funds across TNP programs include:

        a.      During 2009 and 2010, TNP 12% Program and TNP 2008 Scheme were unable to pay certain investor distributions from operating cash flow and relied on new

11

investor proceeds or transfers of cash from TNP or its affiliates in order to make investor distributions;

b.      On four occasions in 2009, funds were transferred from the TNP 2008 Scheme to the Bruin Fund, in an aggregate amount of approximately $186,000.00;

c.      Between April and June 2011 TNP transferred nearly $1,000,000 from the TNP 2008 Scheme to TNP SRT in a purported loan; and

d.      In or around June, 2011, TNP transferred $775,000 from the TNP 2008 Scheme to TNP SRT in a purported loan.

## VI. DEFENDANTS HELP PROMOTE TNP PROGRAMS THROUGH MATERIAL MISREPRESENTATIONS AND OMISSIONS.

62.    Several TNP-sponsored programs, including TNP 12% Program, TNP SRT, TNP 6700 Santa Monica Boulevard, and the TNP 2008 Scheme, were promoted by Berthel Fisher and other broker-dealer firms through misrepresentations and omissions, including:

a.      The Use of Proceeds to be invested by investors in TNP programs was misrepresented by failing to disclose that such proceeds would be and/or were being commingled, used to make payments to other investors, transferred to other TNP programs, and/or siphoned by TNP;

b.      The guarantee offered by TNP for the investors' principal and distribution payments in the TNP 12% Program and the TNP 2008 Scheme was worthless because TNP was never able to make good on such guarantees due to its insufficient equity and deteriorating financials;

c.      The growing and increasingly debilitating losses and cash flow problems TNP was facing, that were threatening its ability to continue to pay its expenses, and to operate and manage the TNP programs, was never disclosed;

12

d.     TNP and its affiliates' dependence on continuously raising new capital from investors to meet financial obligations incurred in connection with past offerings was never disclosed.

63.     Defendants' involvement in the promotion of several other TNP-sponsored programs, such as TNP 6700 Santa Monica Boulevard, DST and TNP Vulture Fund VIII, LLC and particularly the TNP 12% Program, gave Defendants the opportunity to learn the truth about TNP's deteriorating financials, the conversion of investor funds, and TNP's misconduct in connection with the promotion of such other programs.

## VII.   DEFENDANTS PARTICIPATE TO THE PREPARATION OF THE MISLEADING TNP 2008 PPM.

64.     In or around December 2008, Defendants participated in the preparation of the TNP 2008 PPM, which was subsequently used to promote the TNP 2008 Scheme to the investing public.

65.     The TNP 2008 PPM contained several categories of misrepresentations and omissions, as set forth below:

### Misrepresentations and Omissions as to the Use of Investor Proceeds

66.     The TNP 2008 Notes PPM stated that investors' money would be used to fund or invest in real estate and real estate-related debt.

67.     The TNP 2008 Notes PPM included a "Sources and Use of Proceeds" sheet, stating that, provided $25,000,000 is raised, of 100% of the investors' proceeds, 11% would be used for offering-related expenses and commissions and the remaining 89% would be used for "investments."

68.     However, the TNP 2008 PPM failed to disclose that investor proceeds would be used for Ponzi-like payments of "distributions" to earlier TNP 2008 Scheme investors, commingled with

13

funds from other TNP programs, and/or transferred to TNP affiliates in related party transactions that were not in TNP 2008 Scheme's best interest.

## Misrepresentations and Omissions as to TNP

69.     The TNP 2008 PPM made clear that the success of the TNP 2008 Scheme depended upon its management by TNP and upon the skill and expertise of TNP.

70.     To this extent, the TNP 2008 PPM emphasized the role that TNP played in organizing TNP 2008 Offering, identifying and acquiring real estate properties, securing financing for such acquisitions, operating and managing such real estate properties, overseeing TNP 2008 Scheme's financial affairs, handling financial reporting, and making payments to investors, among others.

71.     The TNP 2008 PPM cautioned investors to only invest in the TNP 2008 Scheme if they were "willing to entrust all such aspects of management" to TNP.

72.     While emphasizing the crucial role TNP was going to play in the TNP 2008 Scheme's performance, the TNP 2008 PPM said nothing about TNP's rapidly deteriorating financial situation. The TNP 2008 PPM did not mention the two November 2008 defaults by TNP real estate operations on approximately $1,300,000 past due or the initiation of collection activities by Grubb & Ellis. Nor did it disclose the magnitude of TNP's cash flow problems and its *de facto* insolvency.

73.     The TNP 2008 PPM assured investors that their investment and the interest on that investment would be guaranteed by TNP.

74.     The TNP 2008 PPM included a financial statement of TNP dated September 30, 2008 (the "TNP Balance Sheet"). The TNP Balance Sheet showed $21,801,019 in assets, including Notes Receivable from related party of $6,430,966. Upon information and belief, the $6.4

14

million in Notes Receivable were uncollectible loans to TNP founder Tony Thompson and/or entities controlled by him.

75.    The TNP 2008 PPM did not disclose to investors that the TNP Balance Sheet did not accurately reflect TNP's finances.

76.    The "Risks" section of the TNP 2008 PPM does not disclose that TNP was incurring ever-larger losses. It does not mention possible risks to TNP 2008 Scheme's operations and success arising out of TNP's growing, and already debilitating, financial problems.

77.    To assure investors that their investments were in good hands, the TNP 2008 PPM emphasized the TNP management's "extensive experience" in real estate. It invited investors to "participat[e] in the growth and success" of TNP.

78.    However, the TNP 2008 PPM failed to disclose that TNP was conducting other offerings through misrepresentations and omissions, as more fully detailed above, and was converting funds invested in such offerings by misusing such funds and commingling them without disclosure to, and permission from, investors, in Ponzi-scheme fashion.

79.    The TNP 2008 PPM included a number of Events of Default that would trigger the acceleration of the investor notes' maturity and other investor remedies. Such Events of Default included:

     a.     An event of insolvency or other similar event with respect to TNP, and

     b.     Breaches of TNP 2008 PPM "Covenants" such as violations of the "Use of Proceeds" clause, which mandated that investors' money be used to fund or invest in real estate and real estate-related debt.

15

80. The TNP 2008 PPM did not disclose to investors that Events of Default had already occurred as a result of TNP's insolvency or similar events and because of the violation of the Use of Proceeds clause.

81. In its capacity as Managing Broker-Dealer and underwriter of the TNP 2008 Scheme and because of its role in the preparation of the TNP 2008 PPM, Berthel Fisher became aware of such misrepresentations and omissions in the offering documents of the TNP 2008 PPM. In the alternative, because of its duty to conduct due diligence as to the TNP 2008 Scheme, TNP, and the representations in the TNP 2008 PPM, prior to underwriting the TNP 2008 Scheme's securities offering, Berthel Fisher should have become aware of such misrepresentations and omissions. In particular, the TNP operations' default on past due amounts totaling approximately $1.3 million was publicly reported by Grubb & Ellis in a number of regulatory filings.

82. At all relevant times, Berthel was Berthel Fisher's Chief Executive Officer and Chairman of the Board, as well as one of its indirect owners. Because of his position of control and authority as executive officer, principal, and co-owner of Berthel Fisher, Berthel was able to, and did, direct and control Berthel Fisher's activities, including its preparation of misleading offering documents for the TNP 2008 Scheme.

## VIII. DEFENDANTS FAIL TO CONDUCT ADEQUATE DUE DILIGENCE AS TO TNP AND THE TNP 2008 SCHEME.

83. As the underwriter and Managing Broker-Dealer for the TNP 2008 Scheme, Berthel Fisher received a 1% "due diligence" fee of the TNP 2008 offering proceeds, which proceeds totaled over $26 million.

16

84. Upon information and belief, Berthel Fisher failed to conduct adequate due diligence as to TNP and the TNP 2008 Scheme, prior to engaging in the promotion of the TNP 2008 Scheme to the investing public.

85. In particular, Berthel Fisher became aware of a number of serious red flags surrounding both TNP and the TNP 2008 Scheme, because Berthel Fisher acted as a broker-dealer for other TNP-sponsored programs with offering documents that included TNP's financial statements at different points in time.

86. Such red flags included:

    a. TNP's rapidly deteriorating financial condition;

    b. TNP's default on $1.3 million in financial obligations;

    c. The high rates and return offered by TNP, of up to 13%, and the fact that such returns and principal investment were guaranteed;

    d. High sales and due diligence commissions, of up to 10%, which significantly reduced the funds that were available to generate between 10-13% in annual returns on the total investment, including such commissions;

    e. The concomitancy of the multiple offerings for TNP programs, designed to raise funds for the same types of investments;

    f. Evidence of commingling of funds.

87. Upon information and belief, Berthel Fisher failed to adequately investigate such red flags.

88. Berthel Fisher's ability to conduct adequate due diligence was impaired by the exceedingly high sales and underwriting commissions it stood to make from the promotion of the

17

TNP 2008 Scheme. Such commissions ran as high as 9%, in addition to the 1% due diligence fee.

89.    Berthel Fisher's ability to conduct adequate due diligence was further impaired because it had entered into an indemnification agreement with the TNP 2008 Scheme, which provided that the TNP 2008 Scheme was to indemnify Berthel Fisher from civil liabilities arising out of or related to the TNP 2008 Scheme, including those under the Securities Act. Berthel Fisher's ability to conduct adequate due diligence was further impaired by the conflict of interest in which Berthel Fisher put itself when it, in effect, become an equity partner in the TNP 2008 Scheme.

90.    For its role in promoting the TNP 2008 Scheme to investors, Berthel Fisher was promised 10% of the TNP 2008 Scheme's profits, to be paid by TNP at the end of the program. Such profit participation gave Berthel Fisher an equity stake in the scheme it was promoting.

91.    At all relevant times, Berthel was Berthel Fisher's Chief Executive Officer and Chairman of the Board, as well as one of its indirect owners. Because of his position of control and authority as executive officer, principal, and co-owner of Berthel Fisher, Berthel was able to and did control Berthel Fisher's activities, including its due diligence activities as to TNP and the TNP 2008 Scheme.

## IX.    DEFENDANTS OVERSEE AND MANAGE THE TNP 2008 SCHEME OFFERING THROUGH THE USE OF THE MISLEADING TNP 2008 PPM.

92.    In its capacity of Managing Broker-Dealer and underwriter of the TNP 2008 Scheme offering of securities to investors, including Plaintiff, Berthel Fisher, directly and/or through its agents, approached the TNP 2008 Scheme investors, including Plaintiff, distributed the TNP 2008 PPM to them, and offered and sold them securities issued by the TNP 2008 Scheme.

93.    Berthel Fisher received a commission on each such sale from the TNP 2008 Scheme.

18

94.     Berthel Fisher played an essential role in the promotion of the TNP 2008 Scheme by overseeing, directing, and/or controlling the TNP 2008 Scheme offering and the manner in which it was conducted.

95.     The TNP 2008 PPM distributed to investors included the misrepresentations and omissions set forth above.

96.     At all relevant times, Berthel was Berthel Fisher's Chief Executive Officer and Chairman of the Board, as well as one of its indirect owners. Because of his position of control and authority as executive officer, principal, and co-owner of Berthel Fisher, Berthel was able to and did control Berthel Fisher's activities, including its oversight and management of the TNP 2008 Offering.

## X.     PLAINTIFF AND THE CLASS MEMBERS INVEST IN THE TNP 2008 SCHEME IN RELIANCE UPON THE TNP 2008 PPM.

97.     The TNP 2008 PPM required Plaintiff (and every other TNP 2008 Scheme investor) to acknowledge in writing that he had based his decision to invest in the TNP 2008 Scheme on the TNP 2008 PPM and had relied "only on the information contained in said [TNP 2008 PPM] and has not relied upon any representations made by any other person."

98.     Between December 2008 and about March 2010, in excess of 200 investors, including Plaintiff, purchased securities in the TNP 2008 Scheme, in reliance upon the representations in the TNP 2008 PPM.

99.     The TNP 2008 Scheme raised $26,224,903, from public investors through the use of the misleading TNP 2008 PPM.

100.    Plaintiff invested $75,000 in the TNP 2008 Scheme. Prior to investing, he received the TNP 2008 PPM. He invested in the TNP 2008 Scheme in reliance upon the information in the TNP 2008 PPM, which he believed to be true and accurate. He executed the TNP 2008

19

Subscription Agreement, in which he acknowledged that he was "basing [his] decision to invest in [the TNP 2008 Scheme] on the [TNP 2008 PPM] and [he] ha[s] relied only on the information contained in said Memorandum and [has] not relied upon any representations made by any other person or any prior information."

## XI.  TNP 2008 DEFAULTS ON PAYMENTS TO INVESTORS.

101.  In 2012, the TNP 2008 Scheme defaulted on payments to investors.

102.  TNP never honored the Guarantee.

103.  By March 31, 2012, TNP had negative equity of approximately $45,000,000 and a negative working capital position.

## XII.  FINANCIAL INDUSTRY REGULATORY AUTHORITY DOCUMENTS SECURITIES RULE VIOLATIONS BY TNP 2008 NOTES AND BY UNDERWRITER OF SEVERAL TNP-SPONSORED PROGRAMS.

104.  On or about June 5, 2013, FINRA entered an Order Accepting Offer of Settlement (the "Order") imposing sanctions upon Wendy Worchester, former Co-Chief Compliance Officer of TNP Securities, a securities broker-dealer firm that promoted several TNP-sponsored programs, including the TNP 2008 Scheme, and that was controlled by TNP.

105.  In its Order, FINRA made the following findings of fact as to TNP and the TNP 2008 Scheme:

> During 2009 and 2010, TNP and certain of its affiliated entities were experiencing severe cash flow deficiencies and accruing substantial accounts payable, and the companies lacked sufficient cash or cash equivalents to satisfy creditors in a timely manner.

> During 2009 and 2010, [TNP] 12% Notes and [TNP 2008 Participating Notes] were unable to pay certain investor distributions from operating cash flow and relied on new investor proceeds or transfers of cash from TNP or its affiliates in order to make distributions to investors.

20

106. In its Order, FINRA noted that "the representations in the [TNP 2008 PPM] regarding the financial condition of TNP had become materially misleading" because "they failed to disclose adequately the true deteriorating financial condition of TNP and its ability to fulfill its obligations regarding guaranty of principal and interest" and that representations in the offerings of other TNP-sponsored programs were "inadequate in that [they] failed to disclose the magnitude of the losses or negative net equity of TNP."

## CLASS ACTION ALLEGATIONS

107. This action is brought by Plaintiff, for himself and on behalf of all others similarly situated, as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3).

### Class Definition

108. The proposed Class (the "Class") is defined as follows:

> All persons and entities that purchased, subscribed and paid for, or otherwise acquired securities in the TNP 2008 Scheme pursuant to the TNP 2008 Scheme offering between December 2008 and March 2010.

109. Excluded from the class are: (1) any individuals who signed an agreement with Berthel Fisher pursuant to which they must arbitrate claims against Berthel Fisher, arising out of the sales of TNP 2008 Scheme notes, in FINRA arbitration; (2) Defendants; any judge or judicial officer who may hear any aspect of this case and his or her law clerks; and (3) any person, firm, trust, corporation, or other entity related to or affiliated with Defendants.

### Numerosity

110. The members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable. While the exact number of Class members remains unknown at this time, reports filed by the TNP 2008 Scheme with the Securities and Exchange Commission

21

indicate there are in excess of two hundred members of the proposed class. The exact number of the TNP 2008 Scheme investors is within the knowledge of Defendants.

<u>Commonality</u>

111.    There are common questions of law and fact in this class action that relate to and affect the rights of each member of the Class including, *inter alia*:

    a.    Whether Berthel Fisher, acting in its capacity of underwriter of the TNP 2008 Scheme, intentionally and/or negligently misrepresented and omitted risks associated with the securities issued by the TNP 2008 Scheme in the TNP 2008 PPM, which was provided to each Class member;

    b.    Whether Berthel Fisher, in its capacity of underwriter of the TNP 2008 Scheme, had a duty to the members of the Class;

    c.    Whether t Berthel Fisher, in its capacity of underwriter of the TNP 2008 Scheme, breached duties owed to Plaintiff and the Class by failing to conform its conduct to the requirements of the law and applicable regulations;

    d.    Whether statements or omissions in the TNP 2008 PPM misrepresented material facts about the TNP 2008 Scheme and/or TNP;

    e.    Whether Berthel was Berthel Fisher's control person at all relevant times;

    f.    Whether Berthel, in its capacity of control person of Berthel Fisher, is liable to the members of the Class for Berthel Fisher's misconduct;

    g.    Whether Defendants' misconduct entitles Plaintiffs and members of the Class to rescission and/or damages for the loss of the amounts invested by Plaintiffs and members of the Class;

22

h.    What remedies are appropriate compensation for the damages caused to Plaintiffs and each member of the Class; and

i.    Whether the Plaintiffs and members of the Class are entitled to a reasonable award of attorneys' fees, interest and costs of suit.

## Typicality

112.    The claims of Plaintiff are typical of the claims of all Class members. Plaintiff is situated identically to all members of the Class with respect to the issues presented in this case, as Plaintiff and all members of the Class were investors in the TNP 2008 Scheme and suffered the exact same loss (in proportion to the amount of their investment). The claims of Plaintiff are based on the same fundamental factual allegations and legal theories as the claims of all other members of the Class.

113.    All investors in the TNP 2008 Scheme have been adversely affected by the wrongdoing of Defendants as described herein.

## Adequacy of Representation

114.    Plaintiff will adequately represent and protect the interests of the Class and has no interests that conflict with or are antagonistic to the interests of the Class.

115.    Plaintiff has retained attorneys who are experienced and capable of prosecuting complex litigation such as this case. The attorneys for Plaintiff and the Class will actively conduct and be responsible for the prosecution of this litigation and the expenses thereof. The attorneys for Plaintiff have adequate resources, experience and commitment to litigate this matter.

## Predominance and Superiority

116.    A class action is superior to any other method available for the fair and efficient adjudication of this controversy because it would be impractical and undesirable for each of the

23

individual Class members who have suffered damages to bring separate actions. Some investors invested amounts in the TNP 2008 Scheme that would make it impracticable for them to litigate individualized securities fraud cases concerning this matter. Moreover, the common issues identified above predominate over individual issues, if any, particular to each class member. Defendants made uniform misrepresentations and were responsible for uniform omissions with respect to each member of the Class and each member of the Class was injured in exact proportion to the amount of their investment in the TNP 2008 Scheme.

## COUNT ONE: VIOLATIONS OF CALIFORNIA CORPORATIONS CODE § 25401

117. Plaintiff repeats and re-alleges each of the allegations set forth above.

118. The TNP 2008 Scheme notes offered and sold by Defendants were "securities" within the meaning of Section 25019 of California's Corporate Securities Law of 1968.

119. All of the TNP 2008 Scheme notes were "offered for sale" in the state of California pursuant to California Corporations Code § 25008 because the issuer of such securities was located in California and/or the offers for such notes originated in California, specifically from TNP's headquarters in Irvine, California.

120. Pursuant to California Corporations Code § 25401, "[i]t is unlawful for any person to offer or sell a security in this state . . . by means of any written or oral communication which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."

121. California Corporations Code § 25501 provides that any person who violates § 25401 shall be liable to any other person who purchases a security from him.

24

122.    As set forth above, Defendants offered for sale and sold TNP 2008 Scheme notes to Plaintiff and the members of the Class through numerous untrue statements of material facts as well as omissions of material facts in the TNP 2008 PPM regarding the use of investment proceeds and TNP's history and financial condition.

123.    Such misrepresented and omitted facts are "material" within the meaning of California Corporations Code § 25401 because they were facts a reasonable investor would consider in deciding whether to invest.

124.    Defendants either knew or in the exercise of reasonable care should have known that the misrepresentations and omissions in the TNP 2008 PPM were misleading.

125.    Because of their role in preparing the TNP 2008 PPM, their position of underwriter and Managing Broker-Dealer of the TNP 2008 Scheme, and their role in promoting certain other TNP-sponsored programs, Defendants knew and/or had reasonable grounds to know of such misrepresentations and omissions in such offering documents. In particular, Defendants were aware of the true facts regarding TNP's deteriorating financial condition because they became privy to TNP's financial statements at various points in time by virtue of participating to the promotion of several other TNP-sponsored programs. Also, Defendants were, or should have been, aware of the TNP operations' default on past due obligations totaling approximately $1.3 million, because such information was publicly disclosed by Grubb & Ellis in reports filed with the Securities and Exchange Commission.

126.    To the extent that Defendants are deemed not to be sellers of the TNP 2008 Scheme notes, Defendants are nonetheless liable for the misrepresentations and omissions made in connection with those securities pursuant to California Corporations Code § 25403, because

25

Defendants knowingly provided substantial assistance in the violation of § 25401 for the reasons set forth in the preceding paragraph.

127.    The assistance that Defendants provided to the perpetration of the TNP 2008 Scheme was substantial, indeed essential: in their capacity as Managing Broker-Dealer and underwriter of the TNP 2008 Scheme securities offering, Defendants played a key role in organizing, overseeing, and executing that offering.

128.    Berthel is also liable pursuant to California Corporations Code § 25503 because he directly and indirectly controlled Berthel Fisher and was its principal executive officer and chairman of the board, and in that capacity he directed and controlled Berthel Fisher's misconduct and knew or should have known of such misconduct.

129.    Pursuant to California Corporations Code § 25501, Plaintiff and the members of the Class are entitled to rescission of their purchase of TNP 2008 Scheme notes and recovery of the full amount of consideration paid for such notes as well as interest at the applicable legal rate. Alternatively, Plaintiff and members of the Class are entitled to damages, measured as the difference between the price at which the TNP 2008 Scheme notes were purchased and the value of such notes at the time such notes were disposed of.

## COUNT TWO: VIOLATIONS OF CALIFORNIA CORPORATIONS CODE § 25400

130.    Plaintiff repeats and re-alleges each of the allegations set forth above.

131.    The TNP 2008 Scheme notes offered and sold by Defendants were "securities" within the meaning of Section 25019 of California's Corporate Securities Law of 1968.

132.    All of the TNP 2008 Scheme notes were "offered for sale" in the state of California pursuant to California Corporations Code § 25008 because the issuer of such securities was

26

located in California and/or the offers for such notes originated in California, specifically from TNP's headquarters in Irvine, California.

133. Pursuant to California Corporations Code § 25400, it is unlawful for a broker-dealer or other person selling or offering a security "to make, for the purpose of inducing the purchase or sale of such security by others, any statement which was, at the time and in the light of the circumstances in which it was made, false or misleading with respect to any material fact, or which omitted to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, and which he knew or had reasonable ground to believe was so false or misleading."

134. California Corporations Code § 25500 provides that any person who willfully participates in a violation of § 25400 shall be liable to any other person who purchases a security at a price which was affected by such violation for damages caused by such violation.

135. As set forth above, Defendants made numerous untrue statements of material facts as well as omissions of material facts in the TNP 2008 PPM regarding the use of investment proceeds and TNP's history and financial condition, and adopted such statements when they distributed, and/or directed and oversaw the distribution of, the misleading TNP 2008 PPM to investors.

136. Such false statements and omissions were made for the very purpose of inducing the purchase of TNP 2008 Scheme notes, as they were contained in documents distributed to potential investors.

137. Such misrepresented and omitted facts are "material" within the meaning of California Corporations Code § 25400 because they were facts a reasonable investor would consider in deciding whether to invest.

27

138.    Defendants either knew or had reasonable grounds to believe that the misrepresentations and omissions in the TNP 2008 PPM were misleading.

139.    Because of their role in preparing the TNP 2008 PPM, their position as underwriter and Managing Broker-Dealer of the TNP 2008 Scheme, and their role in promoting certain other TNP-sponsored programs, Defendants knew and/or had reasonable grounds to know of such misrepresentations and omissions in such offering documents. In particular, Defendants were aware of the true facts regarding TNP's deteriorating financial condition because they became privy to TNP's financial statements at various points in time by virtue of participating to the promotion of several other TNP-sponsored programs. Also, Defendants were, or should have been, aware of the TNP operations' default on past due obligations totaling approximately $1.3 million, because such information was publicly disclosed by Grubb & Ellis in reports filed with the Securities and Exchange Commission.

140.    Defendants willfully participated in the above-alleged violation of § 25400 for the reasons set forth in the immediately preceding paragraph. Furthermore, Defendants understood that if the true and complete facts regarding these topics were known by investors, it was highly unlikely that any investors would have chosen to entrust their funds to the TNP 2008 Scheme.

141.    The price of the securities purchased by Plaintiff and the members of the Class were affected by Defendants' violations of § 25400 and thus, such violations were the proximate cause of the losses suffered by Plaintiff and the members of the Class. If the complete facts regarding these topics had been disclosed to investors, the market value of the TNP 2008 Scheme notes at the time of purchase would have been zero (or at the very least substantially less than investors paid for such notes) because no reasonable investor would entrust their funds to the TNP 2008 Scheme, given TNP's intent to misappropriate the investors' funds, its deteriorating financial

28

condition and penchant for misappropriation and commingling of investor funds, and its involvement in promoting Ponzi-like investment schemes.

142. Pursuant to California Corporations Code § 25500, Plaintiff and the members of the Class are entitled to damages, measured as the difference between the price at which the TNP 2008 Scheme notes were purchased and the market value such notes would have had at the time of the purchase in the absence of Defendants' violations of § 25400.

## COUNT THREE: INDUCING A CONTRACT BY KNOWING MISREPRESENTATIONS (CALIFORNIA CIVIL CODE § 1572 AND COMMON LAW)

143. Plaintiff repeats and re-alleges each of the allegations set forth above.

144. As set forth above, Defendants made numerous misrepresentations of material fact and omitted to disclose material information necessary to prevent its representations from being misleading in the TNP 2008 PPM regarding the use of investment proceeds and TNP's history and financial condition.

145. Defendants had knowledge of the falsity and incompleteness of these representations. In the terms used by California Civil Code § 1572, these representations were actually fraudulent because each of them was: (1) "[t]he suggestion, as a fact, of that which is not true, by one who does not believe it to be true"; (2) "[t]he positive assertion, in a manner not warranted by the information of the person making it, of that which is not true, though he believes it to be true"; and/or (3) "[t]he suppression of that which is true, by one having knowledge or belief of the fact."

146. Because of their role in preparing the TNP 2008 PPM, their position of underwriter and Managing Broker-Dealer of the TNP 2008 Scheme, and their role in promoting certain other TNP-sponsored programs, Defendants knew and/or had reasonable grounds to know of such misrepresentations and omissions. In particular, Defendants were aware of the true facts

29

regarding TNP's deteriorating financial condition because they became privy to TNP's financial statements at various points in time by virtue of participating to the promotion of several other TNP-sponsored programs. Also, Defendants were, or should have been, aware of the TNP operations' default on past due obligations totaling approximately $1.3 million, because such information was publicly disclosed by Grubb & Ellis in reports filed with the Securities and Exchange Commission.

147. Defendants nonetheless made such representations with the intent to induce reliance on them by Plaintiff and the members of the Class and to cause them to invest in the TNP 2008 Scheme. Indeed, TNP 2008 Scheme investors were required to acknowledge in writing that they based their decision to invest in the TNP 2008 Scheme on the TNP 2008 PPM and relied "only on the information contained in said [TNP 2008 PPM] and has not relied upon any representations made by any other person." Furthermore, Defendants understood that if the true and complete facts regarding these topics were known by investors, it was highly unlikely that any investors would have chosen to entrust their funds to the TNP 2008 Scheme.

148. Plaintiff and members of the Class justifiably relied on the statements contained in the TNP 2008 PPM. The very purpose of the TNP 2008 PPM was purportedly to advise Plaintiff and the members of the Class of the risks posed by investing in the TNP 2008 Scheme and to inform them of TNP's background and management ability.

149. Defendants' misrepresentations were the proximate cause of the losses suffered by Plaintiff and the members of the Class. If the complete facts regarding these topics had been disclosed to investors, the market value of the TNP 2008 Scheme notes at the time of purchase would have been zero (or at the very least substantially less than investors paid for such notes) because no reasonable investor would entrust their funds to TNP for the TNP 2008 Scheme,

612967v.1

given TNP's intent to misappropriate the investors' funds, its deteriorating financial condition and penchant for misappropriation and commingling of investor funds, and its involvement in promoting Ponzi-like investment schemes.

150.    Plaintiff and the members of the Class thus suffered damage from Defendants' actions. Plaintiff and the members of the Class are therefore entitled to rescind their investments in the TNP 2008 Scheme or in the alternative to damages.

151.    Plaintiff and the members of the Class are also entitled to punitive damages against Defendants pursuant to California Civil Code § 3294 because Defendants have been guilty of oppression, fraud or malice to such an extent that additional damages should be awarded against each of them for the sake of example and punishment.

152.    To the extent Defendants are not deemed to be a primary wrongdoer with respect to such fraud, Defendants are nonetheless liable for aiding and abetting such fraud for knowing and substantial assistance in the fraud for the reasons set forth in paragraphs 144-149.

### COUNT FOUR: NEGLIGENT MISREPRESENTATION
### (CALIFORNIA COMMON LAW)

153.    Plaintiff repeats and re-alleges each of the allegations set forth above.

154.    As set forth above, Defendants made numerous misrepresentations of material facts and omitted to disclose material information necessary to prevent their representations from being misleading in the TNP 2008 PPM regarding the use of investment proceeds and TNP's history and financial condition.

155.    Defendants had no reasonable ground for believing those representations to be true and complete.

156.    Because of their role in preparing the TNP 2008 PPM, their position of underwriter and Managing Broker-Dealer of the TNP 2008 Scheme, and their role in promoting certain other

31

TNP-sponsored programs, Defendants knew and/or had reasonable grounds to know of such misrepresentations and omissions. In particular, Defendants were aware of the true facts regarding TNP's deteriorating financial condition because it became privy to TNP's financial statements at various points in time by virtue of participating to the promotion of several other TNP-sponsored programs. Also, Defendants were, or should have been, aware of the TNP operations' default on past due obligations totaling approximately $1.3 million, because such information was publicly disclosed by Grubb & Ellis in reports filed with the Securities and Exchange Commission.

157. Defendants nonetheless made such untrue and/or incomplete representations with the intent to induce reliance on them by Plaintiff and the members of the Class and to cause them to invest in the TNP 2008 Scheme. Indeed, investors were required to acknowledge in writing that they based their decision to invest in the TNP 2008 Scheme Notes on the TNP 2008 PPM and relied "only on the information contained in said [TNP 2008 PPM] and has not relied upon any representations made by any other person."

158. Plaintiff and members of the Class justifiably relied on the statements contained in the TNP 2008 PPM. The very purpose of the TNP 2008 PPM was purportedly to advise Plaintiff and the members of the Class of the risks posed by investing in the TNP 2008 Scheme and to inform them of TNP's background and management ability.

159. Defendants' misrepresentations were the proximate cause of the losses suffered by Plaintiff and the members of the Class. If the complete facts regarding these topics had been disclosed to investors, the market value of the TNP 2008 Scheme notes at the time of purchase would have been zero (or at the very least substantially less than investors paid for such notes) because no reasonable investor would entrust their funds to TNP or the TNP 2008 Scheme, given

32

TNP's intent to misappropriate the investors' funds, its deteriorating financial condition and penchant for misappropriation and commingling of investor funds, and its involvement in promoting Ponzi-like investment schemes.

160.    Plaintiff and the members of the Class thus suffered damage from Defendants' negligent misrepresentations.

## COUNT FIVE: NEGLIGENCE (CALIFORNIA COMMON LAW)

161.    Plaintiff repeats and re-alleges each of the allegations set forth above.

162.    In their capacity of underwriter and Managing Broker-Dealer for the TNP 2008 Scheme offering, Defendants had a duty to conduct adequate due diligence as to the TNP 2008 Scheme before undertaking to promote it.

163.    To establish the applicable standard of care under the circumstances, the Court may examine professional standards of conduct in the industry.

164.    Defendants owed Plaintiff and the class members the duty to act as a reasonable broker-dealer would do under the same or similar circumstances. The duties set forth herein arise from the regulations, customs and usage of the brokerage trade, including rules promulgated by the Securities and Exchange Commission and by FINRA, a self-regulatory organization to which Defendants belong and whose rules they must obey.

165.    Defendants negligently breached their duties to Plaintiff and the class by:

    a.    failing to perform adequate due diligence regarding the TNP 2008 Scheme securities and failing to obtain reliable information as to the TNP 2008 Scheme and TNP before underwriting the TNP 2008 Scheme offering and distributing or directing and overseeing the distribution of the TNP 2008 PPM to Plaintiff and members of the Class; and

33

b.    failing to warn Plaintiff and the members of the Class that Defendants did not have a reasonable basis to offer and promote and had not adequately vetted the TNP 2008 Scheme notes.

166.    Plaintiff and the members of the Class invested in the TNP 2008 Scheme in reliance upon the misleading TNP 2008 PPM.

167.    As a direct and proximate result of Defendants' negligent due diligence as to the TNP 2008 Scheme, Plaintiff and the members of the Class have suffered damages.

## COUNT SIX: AIDING AND ABETTING FRAUD (CALIFORNIA COMMON LAW)

168.    Plaintiff repeats and re-alleges each of the allegations set forth above.

169.    TNP and the TNP 2008 Scheme perpetrated fraud upon the TNP 2008 Scheme investors because they made misrepresentations and omissions in the TNP 2008 PPM regarding the use of investor proceeds and TNP's financials, as more fully detailed above. Such misrepresentations and omissions were material to the TNP 2008 Scheme investors' decision to invest: they were contained in the document distributed to investors and describing the opportunity in which they were asked to invest. TNP and the TNP 2008 Scheme were aware that the TNP 2008 PPM was untruthful because the statements and omissions therein pertained to TNP and/or the TNP 2008 Scheme's own businesses and financial situations. TNP and the TNP 2008 Scheme intended investors to rely upon such misrepresentations and omissions and invest in the TNP 2008 Scheme. The investors justifiably relied upon the materially misleading TNP 2008 PPM – and so acknowledged in writing – and invested in the TNP 2008 Scheme, incurring damages as a direct and proximate result.

170.    Because of their role in preparing the TNP 2008 PPM, their position of underwriter and Managing Broker–Dealer of the TNP 2008 Scheme, and their role in promoting certain other

TNP-sponsored programs, Defendants knew and/or had reasonable grounds to know of such fraudulent misrepresentations and omissions. In particular, Defendants were aware of the true facts regarding TNP's deteriorating financial condition because they became privy to TNP's financial statements at various points in time by virtue of participating to the promotion of several other TNP-sponsored programs. Also, Defendants were, or should have been, aware of the TNP operations' default on past due obligations totaling approximately $1.3 million, because such information was publicly disclosed by Grubb & Ellis in reports filed with the Securities and Exchange Commission.

171.    Defendants substantially assisted such fraud by TNP and the TNP 2008 Scheme upon Plaintiff and the Class, by playing the leading role in the promotion of the TNP 2008 Scheme to the investing public, as underwriter and Managing Broker-Dealer of the TNP 2008 Scheme. Indeed, Defendants' assistance was essential, in that it made possible the promotion of the TNP 2008 Scheme to Plaintiff and the members of the Class.

172.    The fraudulent misrepresentations and omissions in the TNP 2008 PPM caused damage to the TNP 2008 Scheme investors because such investors relied upon the misleading TNP 2008 PPM to invest in that scheme.

## COUNT SEVEN: VIOLATIONS OF IOWA UNIFORM SECURITIES ACT § 502.501

173.    Plaintiff repeats and re-alleges each of the allegations set forth above.

174.    The TNP 2008 Scheme notes offered and sold by Defendants were "securities" within the meaning of Section 502.102(28) of the Iowa Uniform Securities Act.

175.    All of the violations of the Iowa Uniform Securities Act complained of herein took place in Iowa, where Berthel Fisher's headquarters are located and where Berthel resides and exercised

his direction and control of Berthel Fisher, because the conduct giving rise to such violations by Defendants took place in, or was directed or overseen from, Berthel Fisher's headquarters.

176. Pursuant to Iowa Uniform Securities Act § 502.501, "[i]t is unlawful for a person, in connection with the offer, sale, or purchase of a security, directly or indirectly . . . to make an untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."

177. Pursuant to Iowa Uniform Securities Act § 502.509, "a person is liable to the purchaser if the person sells a security . . . by means of an untrue statement of material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."

178. As set forth above, Defendants, in connection with the offers and sales of the TNP 2008 Scheme notes, made numerous untrue statements of material facts as well as omissions of material facts in the TNP 2008 PPM regarding the use of investment proceeds and TNP's history and financial condition, omitted to correct such misstatements, and adopted such statements when it disseminated and directed the dissemination of the TNP 2008 PPM to investors.

179. Such misrepresented and omitted facts are material because they were facts a reasonable investor would consider in deciding whether to invest.

180. Defendants either knew or in the exercise of reasonable care should have known that the misrepresentations and omissions in the TNP 2008 PPM were misleading.

181. Because of their role in preparing the TNP 2008 PPM, their position of underwriter and Managing Broker-Dealer of the TNP 2008 Scheme, and their role in promoting certain other TNP-sponsored programs, Defendants knew and/or had reasonable grounds to know of such misrepresentations and omissions in such offering documents. In particular, Defendants were

36

aware of the true facts regarding TNP's deteriorating financial condition because they became privy to TNP's financial statements at various points in time by virtue of participating to the promotion of several other TNP-sponsored programs. Also, Defendants were, or should have been, aware of the TNP operations' default on past due obligations totaling approximately $1.3 million, because such information was publicly disclosed by Grubb & Ellis in reports filed with the Securities and Exchange Commission.

182. To the extent that Defendants are deemed not to be sellers of the TNP 2008 Scheme notes, Defendants are nonetheless liable for the misrepresentations and omissions made in connection with those securities pursuant to Iowa Uniform Securities Act § 501.509(7)(d), because Defendants materially aided in the violation of § 501.509 by TNP and the TNP 2008 Scheme, and knew or should have known of such violations for the reasons set forth in the preceding paragraph.

183. The assistance that Defendants provided to the perpetration of the TNP 2008 Scheme was material, indeed essential: in their capacity as Managing Broker-Dealer and underwriter of the TNP 2008 Scheme securities offering, Defendants played a key role in organizing, overseeing, and executing that offering.

184. Berthel is also liable pursuant to Iowa Uniform Securities Act § 501.509(7)(a) and (b) because he directly and indirectly controlled Berthel Fisher and was its principal executive officer and chairman of the board, and in that capacity he directed and controlled Berthel Fisher's misconduct and knew or should have known of such misconduct.

185. Pursuant to Iowa Uniform Securities Act §§ 502.509 and 502.510, Plaintiff and the members of the Class are entitled to rescission of their purchase of TNP 2008 Scheme notes and recovery of the full amount of consideration paid for such notes as well as interest at the

37

applicable legal rate. Alternatively, Plaintiff and members of the Class are entitled to damages, measured as the difference between the price at which the TNP 2008 Scheme notes were purchased and the value of such notes at the time such notes were disposed of.

## COUNT EIGHT: VIOLATIONS OF IOWA UNIFORM SECURITIES ACT § 502.501A

186.    Plaintiff repeats and re-alleges each of the allegations set forth above.

187.    The TNP 2008 Scheme notes offered and sold by Defendants were "securities" within the meaning of Section 502.102(28) of the Iowa Uniform Securities Act.

188.    All of the violations of the Iowa Uniform Securities Act complained of herein took place in Iowa, where Berthel Fisher's headquarters are located and where Berthel resides and exercised his direction and control of Berthel Fisher, because the conduct giving rise to such violations by Defendants took place in or was directed or overseen from Berthel Fisher's headquarters.

189.    Pursuant to Iowa Uniform Securities Act § 502.501A, it is unlawful for a broker-dealer to "effect a transaction in, or induce or attempt to induce the purchase or sale of, any security in [Iowa] ... in violation of [the Iowa Uniform Securities Act]."

190.    Pursuant to Iowa Uniform Securities Act § 502.501, "[i]t is unlawful for a person, in connection with the offer, sale, or purchase of a security, directly or indirectly ... to make an untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."

191.    Defendants violated § 502.501A because it effected transactions in, and/or induced or attempted to induce the purchase of TNP 2008 Scheme notes by Plaintiff and the members of the Class, through material misrepresentations and omissions, in violation of the Iowa Uniform Securities Act.

38

192.    As set forth above, Defendants made numerous untrue statements of material facts as well as omissions of material facts in the TNP 2008 PPM regarding the use of investment proceeds and TNP's history and financial condition, and adopted such statements when it distributed, and/or directed and oversaw the distribution of, the misleading TNP 2008 PPM to investors.

193.    Such false statements and omissions were made for the very purpose of inducing the purchase of TNP 2008 Scheme notes, as they were contained in documents distributed to potential investors.

194.    Such misrepresented and omitted facts are "material" because they were facts a reasonable investor would consider in deciding whether to invest.

195.    Defendants either knew or had reasonable grounds to believe that the misrepresentations and omissions in the TNP 2008 PPM were misleading.

196.    Because of their role in preparing the TNP 2008 PPM, their position of underwriter and Managing Broker-Dealer of the TNP 2008 Scheme, and their role in promoting certain other TNP-sponsored programs, Defendants knew and/or had reasonable grounds to know of such misrepresentations and omissions in such offering documents.  In particular, Defendants were aware of the true facts regarding TNP's deteriorating financial condition because it became privy to TNP's financial statements at various points in time by virtue of participating to the promotion of several other TNP-sponsored programs.  Also, Defendants were, or should have been, aware of the TNP operations' default on past due obligations totaling approximately $1.3 million, because such information was publicly disclosed by Grubb & Ellis in reports filed with the Securities and Exchange Commission.

197.    Pursuant to Iowa Uniform Securities Act § 502.509, Plaintiff and the members of the Class are entitled to damages, measured as the difference between the price at which the TNP 2008 Scheme notes were purchased and the market value such notes would have had at the time of the purchase in the absence of Defendants' violations of Section § 502.501A.

### COUNT NINE: NEGLIGENT MISREPRESENTATION (IOWA COMMON LAW)

198.    Plaintiff repeats and re-alleges each of the allegations set forth above.

199.    As set forth above, Defendants made numerous misrepresentations of material facts and omitted to disclose material information necessary to prevent their representations from being misleading in the TNP 2008 PPM regarding the use of investment proceeds and TNP's history and financial condition.

200.    Defendants were in the business or profession of supplying to investors like Plaintiff and the members of the Class the type of information found in the TNP 2008 PPM. Indeed, Defendants were paid for supplying such information to Plaintiff and the members of the Class. Such information was supplied, and was used, for the purpose of assisting investors in making an investment decision.

201.    Defendants had no reasonable ground for believing the TNP 2008 PPM representations to be true and complete.

202.    Because of their role in preparing the TNP 2008 PPM, their position of underwriter and Managing Broker-Dealer of the TNP 2008 Scheme, and their role in promoting certain other TNP-sponsored programs, Defendants knew and/or had reasonable grounds to know of such misrepresentations and omissions. In particular, Defendants were aware of the true facts regarding TNP's deteriorating financial condition because they became privy to TNP's financial statements at various points in time by virtue of participating to the promotion of several other

40

TNP-sponsored programs. Also, Defendants were, or should have been, aware of the TNP operations' default on past due obligations totaling approximately $1.3 million, because such information was publicly disclosed by Grubb & Ellis in reports filed with the Securities and Exchange Commission.

203. Defendants nonetheless made such untrue and/or incomplete representations with the intent to induce reliance on them by Plaintiff and the members of the Class and to cause them to invest in the TNP 2008 Scheme. Indeed, investors were required to acknowledge in writing that they based their decision to invest in the TNP 2008 Scheme Notes on the TNP 2008 PPM and relied "only on the information contained in said [TNP 2008 PPM] and has not relied upon any representations made by any other person."

204. Plaintiff and members of the Class justifiably relied on the statements contained in the TNP 2008 PPM. The very purpose of the TNP 2008 PPM was purportedly to advise Plaintiff and the members of the Class of the risks posed by investing in the TNP 2008 Scheme and to inform them of TNP's background and management ability.

205. Defendants' misrepresentations were the proximate cause of the losses suffered by Plaintiff and the members of the Class. If the complete facts regarding these topics had been disclosed to investors, the market value of the TNP 2008 Scheme notes at the time of purchase would have been zero (or at the very least substantially less than what the investors paid for such notes) because no reasonable investor would entrust their funds to TNP or the TNP 2008 Scheme, given TNP's intent to misappropriate the investors' funds, its deteriorating financial condition and penchant for misappropriation and commingling of investor funds, and its involvement in promoting Ponzi-like investment schemes.

41

206.    Plaintiff and the members of the Class thus suffered damage from Defendants' negligent misrepresentations.

## COUNT TEN: NEGLIGENCE (IOWA COMMON LAW)

207.    Plaintiff repeats and re-alleges each of the allegations set forth above.

208.    In their capacity of underwriter and Managing Broker-Dealer for the TNP 2008 Scheme offering, Defendants had a duty to conduct adequate due diligence as to the TNP 2008 Scheme before undertaking to promote it.

209.    To establish the applicable standard of care under the circumstances, the Court may examine professional standards of conduct in the industry.

210.    Defendants owed Plaintiff and the members of the Class the duty to act as a reasonable broker-dealer would do under the same or similar circumstances.  The duties set forth herein arise from the regulations, customs and usage of the brokerage trade, including rules promulgated by the Securities and Exchange Commission and by FINRA, a self-regulatory organization to which Defendants belong and whose rules they must obey.

211.    Defendants negligently breached their duties to Plaintiff and the members of the Class by:

        a.    failing to perform adequate due diligence regarding the TNP 2008 Scheme securities and failing to obtain reliable information as to the TNP 2008 Scheme and TNP before underwriting the TNP 2008 Scheme offering and distributing or directing and overseeing the distribution of the TNP 2008 PPM to Plaintiff and the members of the Class;  and

42

b.   failing to warn Plaintiff and the members of the Class that Defendants did not have a reasonable basis to offer and promote, and had not adequately vetted, the TNP 2008 Scheme notes.

212.   Plaintiff and the members of the Class invested in the TNP 2008 Scheme in reliance upon the misleading TNP 2008 PPM.

213.   As a direct and proximate result of Defendants' negligent due diligence as to the TNP 2008 Scheme, Plaintiff and the members of the Class have suffered damages.

## COUNT ELEVEN: AIDING AND ABETTING FRAUD (IOWA COMMON LAW)

214.   Plaintiff repeats and re-alleges each of the allegations set forth above.

215.   TNP and the TNP 2008 Scheme perpetrated fraud upon the TNP 2008 Scheme investors because they made misrepresentations and omissions in the TNP 2008 PPM regarding the use of investor proceeds and TNP's financials, as more fully detailed above. Such misrepresentations and omissions were material to the TNP 2008 Scheme investors' decision to invest: they were contained in the document distributed to investors and describing the opportunity in which they were asked to invest. TNP and the TNP 2008 Scheme were aware the TNP 2008 PPM was untruthful because the statements and omissions therein pertained to TNP and/or the TNP 2008 Scheme's own businesses and financial situations. TNP and the TNP 2008 Scheme intended investors to rely upon such misrepresentations and omissions and invest in the TNP 2008 Scheme, because they included such misrepresentations and omissions in the document distributed to investors and describing the opportunity in which they were asked to invest. The investors justifiably relied upon the materially misleading TNP 2008 PPM – and were required to so acknowledge in writing – and invested in the TNP 2008 Scheme, incurring damages as a direct and proximate result.

43

216.    Because of their role in preparing the TNP 2008 PPM, their position of underwriter and Managing Broker-Dealer of the TNP 2008 Scheme, and their role in promoting certain other TNP-sponsored programs, Defendants knew and/or had reasonable grounds to know of such fraudulent misrepresentations and omissions.  In particular, Defendants were aware of the true facts regarding TNP's deteriorating financial condition because they became privy to TNP's financial statements at various points in time by virtue of participating to the promotion of several other TNP-sponsored programs.  Also, Defendants were, or should have been, aware of the TNP operations' default on past due obligations totaling approximately $1.3 million, because such information was publicly disclosed by Grubb & Ellis in reports filed with the Securities and Exchange Commission.

217.    Defendant substantially assisted such fraud by TNP and the TNP 2008 Scheme upon Plaintiff and the members of the Class, by playing the leading role in the promotion of the TNP 2008 Scheme to the investing public, as underwriter and Managing Broker-Dealer of the TNP 2008 Scheme.   Indeed, Defendants' assistance was essential, in that it made possible the promotion of the TNP 2008 Scheme to Plaintiff and the members of the Class.

218.    The fraudulent misrepresentations and omissions in the TNP 2008 PPM caused damage to the TNP 2008 Scheme investors because such investors relied upon the misleading TNP 2008 PPM to invest in that scheme.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on his own behalf and on behalf of the Class, prays for judgment as follows:

  (a)    Certifying this action as a class action pursuant to Fed. R. Civ. Proc. Rule 23(b)(3);

44

(b)    Certifying Plaintiff as class representative and appointing the under-signed counsel as class counsel;

(c)    Awarding rescission and/or rescissory damages against Defendants, in favor of Plaintiff and the members of the Class, including interest;

(d)    Awarding compensatory damages in favor of Plaintiff and the members of the Class against Defendants, in favor of Plaintiff and the members of the Class, including interest;

(e)    Awarding punitive damages in favor of Plaintiff and the members of the Class against Defendants;

(f)    Awarding Plaintiffs his reasonable attorneys' fees and costs; and

(h)    Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury for all issues triable thereby.


Dated: July 8, 2013                          Respectfully submitted,


                                             */s/ J. Barton Goplerud*
                                             J. Barton Goplerud, AT0002983
                                             HUDSON, MALLANEY, SHINDLER
                                             & ANDERSON, P.C.
                                             5015 Grand Ridge Drive, Suite 100
                                             West Des Moines, Iowa 50265-5749
                                             Telephone:    (515) 223-4567
                                             Facsimile:    (515) 223-8887
                                             Email: jbgoplerud@hudsonlaw.net

                                             Joseph C. Peiffer (*pro hac vice* to be submitted)
                                             Daniel J. Carr (*pro hac vice* to be submitted)
                                             FISHMAN HAYGOOD PHELPS WALMSLEY
                                             WILLIS & SWANSON, LLP
                                             201 St. Charles Avenue, 46th Floor
                                             New Orleans, Louisiana 70170

45

Tel: (504) 586-5252
Fax: (504) 586-5250
Email: jpeiffer@fishmanhaygood.com
Email: dcarr@fishmanhaygood.com

Alan L. Rosca (*pro hac vice* to be submitted)
FISHMAN HAYGOOD PHELPS WALMSLEY
WILLIS & SWANSON, LLP
526 Superior Avenue, Suite 401
Cleveland, Ohio 44114
Tel: (216) 570-0097
Fax: (504) 586-5250
Email: arosca@fishmanhaygood.com

ATTORNEYS FOR PLAINTIFF

46